Longenecker, Appellant, *v.* Zion Evangelical Lutheran Church.

|  200  |  567 |
| 212  |  516 |

*Gift—Gift of bonds to a church—Evidence.*

A gift of bonds to a church by an elderly woman in her sound senses, for the consideration of the payment of interest to her on the bonds during her life, and a covenant to keep in repair her cemetery lot, will be sustained, where it appears that neither the pastor of the church nor its officers committed any fraud in the transaction, and did not unduly persuade the donor, that the suggestion as to the gift came from a person not connected with the church, and that the amount of the bonds given was not such a portion of the donor's estate as would in anywise embarrass her, or seriously diminish it.

Argued May 23, 1901.   Appeal, No. 153, Jan. T., 1901, by plaintiff, from decree of C. P. Lancaster Co., Equity Docket No. 3, page 317, dismissing bill in equity in case of Elizabeth Longenecker v. Zion Evangelical Lutheran Church of Manheim, Lancaster Co., M. L. Snyder, Pastor; Christian Bear, Treasurer, and Ezra Reist, President of the Church Council, and M. L. Snyder and Ezra Reist, and the County of Lancaster and Jacob Stoner, County Treasurer.   Before McCOLLUM, C. J., MITCHELL, FELL, MESTREZAT and POTTER, JJ.   Affirmed.

Bill in equity for a reassignment of bonds. LANDIS, J., filed the following opinion:

## FINDINGS OF FACT.

The following are the facts of this case, as presented before the court:

It may, perhaps, be better, for a full comprehension of the circumstances out of which this controversy has arisen, to begin at its very origin and trace down the various acts and situations of all the parties.

Elizabeth Longenecker, the plaintiff, is a resident of Penn township, Lancaster county. She was in her eighty-eighth year at the time of the filing of this bill, and, immediately prior to that time, was a communicant of the Zion Evangelical Lutheran Church of the borough of Manheim, in said county. She can read English, and could formerly write; but, of late years, on account of the lameness of her arm, she makes her mark. The said Zion Evangelical Lutheran Church is a corporation, organized and existing under the laws of Pennsylvania, having its place of worship in said Manheim borough. Rev. Martin Luther Snyder was formerly its pastor; but, since the filing of this bill, he has resigned from that position. Ezra Reist is the president of the Church Council, Christian Bear is the treasurer, and John W. Gish is the secretary. For at least three years prior to the filing of this bill, Ezra Reist has been acting as the agent and business adviser of the said Elizabeth Longenecker, and, as such, he had access to her private papers and securities. She had a box in the Keystone National Bank, one key of which was held by Ezra Reist and the other she retained herself. For some years past, she has held a bond of $500 against the said church, and the interest upon the same has been regularly paid to her up to April 1, 1900. Prior to October 5, 1899, she was also the owner of eight bonds, issued by the county of Lancaster, numbered 277, 278, 279, 280, 281, 282, 283 and 284, respectively, for the sum of $500 each, and one bond numbered 245, for the sum of $1,000, making the aggregate $5,000; and she also held another bond of said county for the sum of $1,000. These securities were kept by her in the above mentioned safe deposit box.

It seems that Miss Annie Weidner was the housekeeper of a

man by the name of Jacob Beamsderfer, who resided opposite to the place where Mrs. Longenecker lived. Miss Weidner was not, in any way, connected with the Zion Evangelical Lutheran Church; but, after a visit made by Mrs. Longenecker to Donegal, she spoke to Miss Weidner about the nice cemetery she saw up there, and told her that her children would not keep up her graves after her death. To this, Miss Weidner replied that, if she had as much money as Mrs. Longenecker had, she would give to the church a certain amount and make a bargain that it should keep up the graves. Mrs. Longenecker then said that she wanted to talk to Mr. Reist about it, and here the matter rested. This conversation was repeated by Miss Weidner to Mr. Beamsderfer, and Mr. Beamsderfer communicated it, first, to Mr. Reist, and, afterwards, to Rev. Mr. Snyder. Mr. Snyder then called upon Mrs. Longenecker. He says he told her that Mr. Beamsderfer had said to him that she wished some one in the church to call upon her, and, also, that she desired to do something for the church. He stated that she replied she had made up her mind to give something to the church, and she would give it in bonds. He was not certain that the amount was named; but it was as much as she had given to her daughter Maria, and he further stated that she requested him to tell Mr. Reist to bring out the bonds and fix it up for her. The conditions of the gift, as Mr. Snyder communicates them, were, that the church should pay the interest on the money to her during her life, and should keep up the graves.

Snyder immediately called upon Reist, but did not find him at home. The next day he called again, saw Reist and told him about his conversation with Mrs. Longenecker. It did not suit Reist on that day to go out, and it was, therefore, arranged that he should advise Snyder whenever it was convenient for him to go. The succeeding day it was agreed that Reist should come out in the afternoon of October 5, and that Snyder should precede him. Reist says that he fixed 2 o'clock as the time, while Snyder says it was to be after dinner. In accordance with this arrangement, Snyder first arrived at Mrs. Longenecker's house. All the parties agree in this, although Mrs. Grosh says that he waited outside until Mr. Reist came and then both of them came into the house together, whereas

Snyder and Reist testify that Snyder was in the house when Reist arrived, and Snyder says he thinks he had been there about ten minutes. Reist tells us that he came for a twofold purpose: First, because the time for cutting off the coupons on the county bonds had arrived; and, second, because of the notice received from Snyder. He brought the bonds with him, as was his custom when the coupons were to be detached. They consisted of the ten bonds above mentioned. After cutting off the coupons in Mrs. Longenecker's presence, he and Snyder both say that she then informed them that she wanted to give some of these bonds to the church; that she had given $5,000 to her daughter Maria, and she would give $5,000 to the church. Reist says that he called her attention to the fact that she had only given Maria $4,000 of county bonds and a $500 Manheim borough bond; but she replied: " Yes, but I gave Maria of her own that I had against her." They say she then told them that she had no reason to believe that her son would look after her and her graves, and that she wanted to give this money to the church, so that they might be kept in good condition, and that, while her daughter Maria was good to her, the time might come when she could not provide for the graves. This seemed to have been her chief motive at that time, for she spoke to them concerning the graves of the soldiers that were buried at Donegal and how nice they were kept long after they had been forgotten. She stipulated that interest was to be paid to her at the rate of five per cent during her life. Mr. Snyder asked why she asked the church five per cent while she was only getting three and a half from the county, to which she replied that the church would pay interest during her life, and, after she was dead, it would get all, and that, while it was not enough, the county would not pay more. They swear that the bonds were counted out, one by one, until $5,000 were laid aside, and that the remaining bond of $1,000 she put in a different place. The transfers were filled up by Ezra Reist, and she signed them, in the presence of him and the minister. They were then taken away by Mr. Reist; the $1,000 bond was placed in the bank box, and the $5,000 were kept by him. An agreement was prepared for execution by the church council, whereby the church promised to pay to her $250 per annum from October 5, 1899, during her natural life, and also agreed

to keep in repair forever her cemetery lot, located in Fairview cemetery, Penn township; and, to this agreement, the president, treasurer and secretary signed their names and affixed the seal of the corporation. On March 28, 1900, the semi-annual interest of $125 was paid, and it was shown that Mrs. Longenecker received communion from Mr. Snyder twice after the execution of the paper, and as late as April, 1900. After the bonds were delivered to the church treasurer, $2,000 of them were used in paying a debt of that amount held by Henry Arndt; $2,000 were transferred to Christian Bear individually, partly to, pay a debt due him and partly for cash; and one bond of $1,000 still remains in his hands for the church. Of the money received, $500 was used for the purchase of a lot for a parsonage.

As against this statement, Mrs. Longenecker was examined. A reference to her testimony will show that it is of such an uncertain nature that it is entitled to little weight. She seems to have an understanding of what transpires before her. She can count, and, as has been before stated, can read English; but she says she is very forgetful, and the answers to many of the questions put to her would lead one to suppose that this was the truth. Her mental capacity, at the time of the transfers, has, however, not been attacked. She admits that Mr. Snyder and Mr. Reist were at her house, but seems, now, not to remember anything of the transaction which took place on October 5, and insists that she had loaned the church $500 on a bond, which was, of course, correct, but the time when this was done long antedated the present transaction. Her housekeeper, Mrs. Grosh, has also testified. This lady was not in the room when the transfers were made. She alleges she sat in the kitchen and heard all that went on in the room between Mrs. Longenecker, Mr. Reist and Mr. Snyder, and that what was then done was in reference to the $500, and nothing was ever mentioned about $5,000. We cannot see why the presence of either Reist or Snyder should have induced extraordinary attention on her part; nor do we think it did. She is no doubt testifying to what she believes to be correct; but it is doubtful whether much reliance can be placed upon her version of the case. It will be recollected that neither Reist nor Snyder had any personal interest to advance. Even though they were con-

nected with the church, they did not originally come of their own motion. Their testimony seems to be consistent, and is in accord with the original suggestion made by Miss Weidner to Mrs. Longenecker, quite independently of them.

In examining this case it is our duty to look upon it from a view that will shed light on the actual occurrences as they happened on October 5. Carefully considering and weighing all the facts, we have felt forced to conclude that Snyder and Reist have given us the true story. The minister may have, with the officiousness and overzeal belonging to some—though, happily, by no means to all—of his class, somewhat hastened to a conclusion the resolution already formed and often before expressed by Mrs. Longenecker, to make such a gift; but this of itself is not evidence of fraud or undue influence. He had only been pastor of the church eight days preceding the signing of the transfers, and had seen Mrs. Longenecker but twice before. There is no testimony in the case that Mr. Reist in any way induced, or attempted to induce, this old lady to do what is now made the subject of this complaint; but, on the contrary, it was shown by him that she often declared her intention of making some such gift. We, therefore, find as a fact that Mrs. Longenecker did, on October 5, 1899, transfer to Christian Bear, treasurer of the church, $5,000 of Lancaster county bonds, and that, when she did so, she did it voluntarily and with a full knowledge and comprehension of the act that she was then doing, and that this transfer was not made by coercion or undue influence on the part of either the Rev. M. L. Snyder or Ezra Reist, nor was it done by means of fraud, coercion or misrepresentation to her upon their part. We also find that the amount of bonds thus given was not such a portion of the plaintiff's estate as would in anywise embarrass her or seriously diminish it. Her estate consisted of about $47,000 in bonds, judgments and mortgages. She also held a farm, for which she paid some years ago $19,000, besides owning the house in which she lived.

### CONCLUSIONS OF LAW.

It was said by Sir Samuel Romilly, in Huguenin v. Basely, 14 Vesey, 273: " This court never did, and never will, annul donations merely as being improvident and such as a wise

man would not have made or a man of very nice honor accepted. Nor will this court measure the degree of understanding, and say that a weak man, provided he is out of reach of a commission, may not give as well as a wise man. But, though this court disclaims any such jurisdiction, yet, where a gift is immoderate, bears no proportion to the circumstances of the giver, and the giver is a weak man, liable to be imposed upon, this court will look upon such a gift with a very jealous eye and very strictly examine the conduct of the person in whose favor it is made." See also Graham v. Pancoast, 30 Pa. 89; Nace v. Boyer, 30 Pa. 110.

The doctrine may be laid down as generally true that the acts and contracts of persons who are of weak understanding and who are thereby liable to impositions will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented, or overcome by cunning or undue influence. The proper inquiry is, the bounties of the giver; the pure, voluntary, understood acts of the mind; were the gifts executed, not only voluntarily, but with all the knowledge of their effect, nature and consequences, which the defendants were bound, by their duty, to communicate to her; for, when one divests himself of his estate without receiving an equivalent, it is incumbent on the person who receives or profits by the gift to give an account of the transaction as will satisfy a chancellor that the donor was of sound mind and had a full and accurate understanding of the nature of the act and the consequences it would produce: Phillipson v. Kerry, 32 Beavan, 628; Lord ELDON, in Huguenin v. Basely, supra. It is not enough to show that the settlor read the deed, or that it was read to him, or that he understood it as well as any unprofessional man could be supposed to do; but it must be established that it was so explained to him that he might understand: Russell's Appeal, 75 Pa. 269.

The circumstances of each case, therefore, are to be carefully considered and weighed, the general rule being of a kind necessarily so little capable of exact definition; and on the result of the inquiry we are to say, has or has not an undue influence been exerted and undue advantage taken? The grounds are narrow upon which a court of equity will interpose for such a

purpose. It is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice of the case requires it: Carney v. Carney, 196 Pa. 34; Simon v. Simon, 163 Pa. 292.

Advice, or even persuasion, to make a deed or will in a particular way is not fraudulent. There must be something more, something that amounts to imposition or circumvention, a species of moral constraint that takes away the free agency of the party, before his deed or will can be set aside: Nace v. Boyer, supra. A transaction between persons in a confidential relation is regarded with jealousy and solicitude, and, if there be fraud, or any trace of undue or unfair advantage, redress will be given to the injured party: Miskey's Appeal, 107 Pa. 630.

Therefore, the court held that the principles recognized in all the cases were, that, whenever a person obtains, by voluntary donation, a large pecuniary benefit from another, the burden of proving that the transaction is righteous falls upon the person taking the benefit; but this proof is given if it be shown that the donor knew and understood what it was that he was doing: See Houghton v. Houghton, 13 Beaven, 278.

The fraud which will avoid such a contract need not be actual fraud. Constructive fraud often exists where the parties to the contract have a special confidential or fiduciary relation, which affords the power and means to one to take advantage of, or exercise undue influence over, the other. Wherever, from such relation, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself: Darlington's Appeal, 86 Pa. 518. This confidential relation is not at all confined to any specific association of the parties to it. While its more frequent illustrations are between persons who are related as trustee and cestui que trust, guardian and ward, attorney and client, parent and child, and husband and wife, it embraces partners and copartners, principal and agent, master and servant, physician and patient, and generally all persons who are associated by any relation of trust and confidence: Darlington's Estate, 147 Pa. 624; Stepp v. Frampton, 179 Pa. 284.

There is high English authority for the position that the general rule is, that, whenever a person obtains a voluntary donation, a pecuniary benefit, from another, he has the burden of proof to sustain the transaction, though Lord ROMILLY, in Cooke v. Lamotte, 15 Beavan, 234, adopted it with much reserve. The American courts, however, had not usually required such proof from the donee until he is put on the defensive by the appearance in the case of some indication of weakness of mind, undue influence, fraud, deception, confidential relation, or other element, to render the transaction at least suspicious: Hasel v. Beilstein, 179 Pa. 560; Stepp v. Frampton, supra; Coleman's Estate, 193 Pa. 605.

But, where the grantee takes merely as trustee or executor, and has no personal or selfish end in view, the presumption of undue influence is measurably repelled, and it may not be incumbent on him to call in third parties to give unbiased advice which he is equally competent to afford. In such cases, there must be evidence of such direct influence used at its making as to destroy the free agency of the testator: Boyd v. Boyd, 66 Pa. 283. The mere circumstance that the donor is a member of the donee's congregation does not afford a presumption of such undue influence or render it incumbent on the donee to show that he was not instrumental in obtaining the gift: Mrs. Greenfield's Estate, 24 Pa. 232.

When, however, no one occupying a fiduciary position has reaped directly any profit from the gift, but the gift or contract is obtained by fraud or undue influence, it is, nevertheless, invalid, not only between the parties, but as regards third persons who received the benefits. One who knowingly profits by a wrong becomes particeps criminis, however innocent he may have been in the first instance: Irwin v. Keen, 3 Wharton, 347. Let the hand receiving it be ever so chaste, yet, if it comes through a polluted channel, the obligation of restitution will follow it: Huguenin v. Basely, supra. No one, be he near or remote, can justly found a claim or title on a voluntary instrument which is not the well understood act of the donor's mind: Russell's Appeal, 75 Pa. 265; Gordon v. McCarty, 3 Wharton, 407.

It is not for us to say whether a Christian sense of propriety and right would not restore this gift to the now reluctant giver,

and remove from the church the suspicion of having reaped the fruits of an old woman's whim, turned so quickly to regret. We are but to determine the bare legal question involved, and to decide, according to the strict letter, whether or not, at the time of the giving, her act was voluntary, with the knowledge of its effect, nature and consequences, and free from undue influence. If it was, then this bill should not be maintained.

In the first place, the plaintiff had an estate of, at least, $60,000. A gift of $5,000 from that estate could not, therefore, be considered as immoderate and as bearing an undue proportion to the circumstances of the giver. It does not, therefore, fall within that class from which the improvidence of the gift itself is to be taken as some evidence of a want of understanding of the transaction on the part of a donor, which, with the other evidence, should be held sufficient to avoid the gift.

The Rev. Mr. Snyder had been admitted to the bar prior to his being ordained as a minister of the gospel; but he had never practiced that profession and did not sustain any such relation to Mrs. Longenecker. It is likely that she had no knowledge of his former calling. He was a comparative stranger to her, and he exercised no peculiar influence over her by reason of having taken her particularly in charge. Because he sustained the relation of minister to the congregation of which she was a member, no presumption of undue influence is raised; and it is not, by reason of that relation, primarily incumbent upon him to show that he was free from fraud in the part he took in the obtaining of this gift. That being the case, the principle of law may be invoked that, where fraud is alleged in the procuring of written instruments, the evidence of it must appear clear, precise and indubitable, in order to rescind the executed conveyance. Nothing but fraud or palpable mistake are grounds for rescission, for, when the parties have deliberately put their engagement in writing, the law declares the writing to be, not only the best, but the only evidence, of their agreement: Martin v. Berens, 67 Pa. 459; Hoffman v. Bloomsburg & Sullivan R. R., 157 Pa. 174; Pennsylvania Railroad Company v. Shay, 82 Pa. 198.

There has been no evidence of mistake produced in this case, and the only evidence of fraud is that which arises from the

testimony of Mr. Longenecker and Mrs. Grosh. That testimony has been positively contradicted by Mr. Snyder and Mr. Reist, and we have found that, with the other facts of the case, the alleged fraud has not been sufficiently made out. It is true that no particular number of witnesses is necessary to establish fraud. A preponderance of evidence, as in any other civil case, is sufficient, provided the proof is clear and strong enough to preponderate over the general and reasonable presumption that men are honest and do not ordinarily commit frauds: 14 Am. & Eng. Ency. of Law, p. 202; Young v. Edwards, 72 Pa. 267. But it has been held that, where one or more witnesses affirm the existence of fraud and an equal number deny its existence, and there is nothing to show that the one is more credible than the other, the fraud is not established. Fraud cannot be presumed, but must be established by a preponderance of the evidence: Allison v. West, 63 Mich. 128. This principle can, with propriety, be applied here.

The case before us is not one which involves a fraudulent obtaining of property from a principal by an agent or minister of the gospel for the personal use of such agent or minister; nor is there any dispute concerning the intention of Mrs. Longenecker to make a gift to the church of some amount. Long before, her will contained a bequest of $500, and she had declared her purpose to do something more. The controversy resolves itself into the question as to whether she intended to give the county bonds, amounting to $5,000, or to give only the bond for the money she had already loaned to the church, amounting to $500. She was an old lady, it is true; but after her husband's death, with the help of her son Cyrus, she attended to, and cared for, a rather large estate, and upon the son's death, she did the same, with the aid of Ezra Reist. There is no evidence to show that she had not a perfect comprehension of her affairs and the manner in which her money was invested, and we feel that it would be presuming too much and going beyond the scope of a reasonable belief to conclude that these two men, one a minister of the gospel and the other a man whose standing in his community has not, in any wise, been impeached, would deliberately falsify the transaction and thus obtain $5,000 where only $500 was intended, not for themselves, but merely for their religious organization. Only upon the basis that the

end justifies the means, could such a base action rest. We are not convinced that this is probable. It is more likely that the old lady's change of mind and discontent were brought about through the influence of her daughter, when she learned what had taken place. The true cause would seem to appear in her words, subsequently uttered in the presence of her daughter, "They fetched me round." While we are not disposed to say that this daughter had not a perfect right to complain of the extent of the gift, if she felt that she and her children had been aggrieved thereby; yet, it having been fairly, fully and voluntarily made, the repentance came too late, for she was incapable, afterwards, upon that ground, of destroying it: Greenfield's Estate, 14 Pa. 503.

We are, therefore, of the opinion that this bill should be dismissed at the costs of the plaintiff.

*Error assigned* was decree dismissing the bill.

*W. H. Keller* and *John A. Coyle*, for appellant.

*W. U. Hensel*, with him *D. McMullen*, for appellee.

PER CURIAM, October 11, 1901 :

This was a bill in equity filed by the plaintiff to compel the Zion Evangelical Lutheran Church, M. L. Snyder and Ezra Reist, defendants, to return and reassign to the plaintiff $5,000 of bonds of the county of Lancaster, alleged to have been fraudulently obtained by them. An answer was filed to the bill and the case was heard under the equity rules in the court below. An opinion was filed by Judge LANDIS dismissing the plaintiff's bill, from which decree the plaintiff appealed. The opinion presented as aforesaid was exhaustive and satisfactory. It plainly showed that the testimony relied on by the plaintiff was not sufficient to sustain her bill, and that the evidence submitted by the defendants was quite sufficient to render nugatory the allegations of fraud. We therefore affirm the decree dismissing the plaintiff's bill.

Decree affirmed.