McCown et al. *v.* Fraser, Appellant, et al.

Argued April 22, 1937.   Before KEPHART, C. J., MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John C. Bell, Jr.,* with him *Joseph C. Henry,* for appellants.

*Joseph J. Brown,* with him *John Arthur Brown* and *D. Alexander Wieland,* for appellees.

OPINION BY MR. JUSTICE BARNES, June 25, 1937:

Susan Bird McCalla, a resident of Philadelphia, died January 29, 1935, at the age of ninety-eight years. She had never married and, as the last of her generation of a prosperous and well-established family, she was possessed, by inheritance from her father and other relatives, of a substantial estate. In May, 1926, as a result of chance meeting on a public bus, Miss McCalla became acquainted with one Arthur Fraser, a young man then twenty-two years of age and employed as a clerk in a hotel at Atlantic City. Fraser had left his home in Canada at the age of fifteen, and, until he came to Atlantic City several months before, had been employed at several places in Ohio, Michigan and western Pennsylvania. In the space of three or four weeks his acquaintance with decedent had so developed that Fraser gave up his employment and in June, 1926, came to live with Miss McCalla at her home, 3915 Walnut Street, in Philadelphia, where for many years she had lived alone, except for her household servants. Thereafter, until Miss McCalla's death, Fraser engaged in no business occupation and was entirely supported by her, having no money or property, save that which he re-

ceived from her. During the period of Fraser's residence with Miss McCalla, he obtained from her property valued at over $170,000, in the form of cash, securities and real estate. In addition, he was the beneficiary of a trust created by the decedent shortly before her death, and a legatee under her will. Her total estate at the time of her death had dwindled to an amount appraised at $76,084.98, as the result of the transfers of her property made to Fraser.

Plaintiffs, nieces of the decedent, are her closest surviving next of kin, and the residuary legatees under her will. Upon learning, after her death, of the extent to which decedent's property had been depleted, plaintiffs instituted this proceeding in equity to recover the property for her estate. The bill alleges that this property was given to Fraser by the decedent without consideration and as a result of the undue influence which he exercised upon her. It prays that the deeds conveying real estate from the decedent to him be cancelled, that the deed of trust executed by the decedent in his favor be set aside, and that he be required to account for and pay over or deliver all moneys and securities which he received from her. No relief is sought against the Real Estate-Land Title & Trust Company which is joined as defendant in its capacity as an executor of the decedent's will, and as trustee under the deed of trust. After lengthy hearings over a period of months, the learned chancellor found that the allegations of undue influence were sustained by the evidence, and entered a decree nisi as prayed for in the bill, cancelling the conveyances of real estate, setting aside the deed of trust and ordering Fraser to pay over the sum of $65,910.31 received by him in cash and securities from the decedent in her lifetime. Exceptions to this adjudication were dismissed by the court in banc, and the decree made final. The defendant, Fraser, has appealed from this decree both in his individual capacity and as trustee.

Appellant's counsel have filed almost two hundred and fifty assignments of error. It is, of course, impossible for us to discuss within the limits of this opinion so many objections, most of which might have been included within a few carefully chosen assignments raising all the questions properly involved. That this could have been done is shown by the fact that appellant's contentions are completely summarized upon one page of his brief and disclose but two basic questions: Does the evidence support the findings of the chancellor and the court below? Did the chancellor err in placing upon appellant the burden of disproving undue influence?

The instant proceeding relates solely to gifts made by the decedent during her lifetime. The principles of law applicable to cases of this kind are well established. Gifts made inter vivos are normally valid. The right to dispose of property is an incident of ownership, and a gift is none the less valid because it is undeserved or improvident: *Longenecker v. Church,* 200 Pa. 567. As Mr. Justice PAXSON said in *Cauffman v. Long,* 82 Pa. 72, 77: "a man's prejudices are a part of his liberty." He has a right to the control of his property while living, and may bestow it as he sees fit. Even in the case of gifts causa mortis, which are often made under suspicious circumstances, the law does not limit the amount which may be thus disposed of: *Elliott's Est.,* 312 Pa. 493. But if it is shown that the donee of a gift stood in a confidential relation to the donor, the burden rests upon the recipient to prove that the transaction was in all respects fair and beyond the reach of suspicion: *Darlington's App.,* 86 Pa. 512; *Matthaei v. Pownall,* 235 Pa. 460; *Thorndell v. Munn,* 298 Pa. 1.

It is impossible to define precisely what constitutes a confidential relation. It is not restricted to any specific association of persons. In some instances, as between trustee and cestui, attorney and client, and guardian

and ward, it is declared to exist as a matter of law; in others, as, for example, between parent and child, the existence of such relation is a question of fact to be determined from the evidence presented: *Leedom v. Palmer*, 274 Pa. 22; *Null's Est.*, 302 Pa. 64. In general it may be said that a confidential relation will be deemed to exist whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other: *Darlington's App.*, supra; *Miskey's App.*, 107 Pa. 611; *Longenecker v. Church*, supra. In such case the party in the superior position is obligated, legally as well as morally, to act with the most scrupulous fairness and good faith, and to refrain from using the trust and confidence reposed in him to secure an advantage for himself: *Null's Est.*, supra. Hence, when it appears that, by an inter vivos transaction, he has obtained a gift or other benefit from his confidant, he must, if the matter is questioned, prove affirmatively that it is unaffected by any taint of undue influence, imposition or deception: *Darlington's App.*, supra; *Stepp v. Frampton*, 179 Pa. 284; *McConville v. Ingham*, 268 Pa. 507; *Null's Est.*, supra. Such a transaction will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained to him, and done with a knowledge of its consequences: *Matthaei v. Pownall*, supra; *Corrigan v. Conway*, 269 Pa. 373; *Williams' Est.*, 299 Pa. 440.

Where the gift is made in a will, however, the rule is not so stringent: *Caughey v. Bridenbaugh*, 208 Pa. 414; *Phillips' Est.*, 244 Pa. 35, 44. A testator's interest in his property necessarily terminates at death, whereas it is opposed to the common experience of mankind for one yet alive and able to enjoy his property to divest himself of a substantial part of his estate voluntarily and without consideration. Therefore the law does not view

a testamentary disposition with so suspicious an eye. Where a gift is made by will to one standing in a confidential relation, the burden of disproving undue influence is not placed upon the beneficiary named in the will unless it is also shown that the testator lacked testamentary capacity or that in the making of the will his mind was under the beneficiary's control: *Gongaware v. Donehoo,* 255 Pa. 502; *Buechley's Est.,* 278 Pa. 227; *Koons's Est.,* 293 Pa. 465; *Mark's Est.,* 298 Pa. 285; *Keen's Est.,* 299 Pa. 430. These, and other authorities cited by appellant can have no application to the facts of the present case, for, as we have seen, the gifts here attacked were made inter vivos and not by will.

It would unduly encumber this opinion to review at length the testimony concerning the various transactions between Fraser and Miss McCalla covering the period of over eight years of their association. Counsel, with zealous and painstaking attention to detail, have analyzed the evidence of the case, and with like care we have examined the entire record, consisting of nearly two thousand pages of testimony and exhibits. Where, as here, the chancellor's findings have been approved by the court in banc, they have all the force and effect of a jury's verdict, and ordinarily will not be disturbed on appeal. The question now for consideration is not "whether we, as hearing judges, would have reached the same conclusion, but whether the evidence may fairly be said to support the conclusion of the judge who saw and heard the witnesses": *Custis v. Serrill,* 321 Pa. 154.

Turning now to the facts of the case, our reading of the record convinces us that the chancellor could not properly have found otherwise than that a confidential relation existed between Fraser and Miss McCalla. The testimony of almost every witness lends support to this conclusion, and we do not believe appellant seriously disputes this finding. From the time he came to decedent's home until the day of her death, they

lived together in the closest association. The relationship was, as numerous witnesses said, like that of a mother and a favorite son. Indeed, decedent frequently referred to Fraser as her "adopted son" or "nephew," and he assumed her surname, McCalla, as his Christian name. Within a few months of the time Fraser came to live with decedent she purchased a burial lot and provided for her funeral; she gave instructions that Fraser should make the arrangements for the funeral as he was the one who was taking care of her affairs and co-operating with her. She made him an executor and trustee under her will, although she knew him to be financially irresponsible and a spendthrift. She gave him marketable securities to hold as trustee for her, the proceeds of which he squandered in speculation. She gave Fraser the power to endorse checks for her and to obtain her cancelled checks and bank statements. It was shown that on frequent occasions she signed checks at his solicitation without questioning the amounts or the necessity therefor, and that in addition she gave him large sums of money for his own purposes. The defendant trust company, which managed her investments, considered the relation between decedent and Fraser so close that it paid money to him out of her account upon his representations that she was too ill to sign checks. Repeatedly decedent told others of the confidence she placed in Fraser and her concern for him. In the words of one of appellant's witnesses, "I would say from the way she spoke to me that Arthur was the whole show." The record is replete with such testimony. It remains uncontradicted and unimpeached, and proves conclusively that decedent placed the utmost trust and confidence in Fraser and consulted him about all matters with which she was concerned. Cases of this kind, where the existence of a confidential relation depends upon all the circumstances, necessarily rest upon their own facts, and, as we view those facts, they establish that such was the relation between decedent and Fraser.

It is argued, however, that the relation between the parties was like that of parent and child, and there is no proof of special trust or dependence ordinarily deemed to be confidential. This argument overlooks the fact that Fraser was not the son of decedent, nor even of her kin, but a stranger over sixty-five years her junior. Under these circumstances, the fact that, within a few weeks after a casual acquaintance, Fraser gained such a place in her affections that he lived with her in her home as a son and was thereafter supported by her, is indicative of the high degree of trust and confidence which she reposed in him.

To sustain the burden which plaintiffs' evidence placed upon him of disproving undue influence, appellant produced numerous witnesses, who testified that on almost all occasions Miss McCalla expressed her regard and concern for Fraser, and told of the affection which existed between them. It was further shown that, while physically somewhat enfeebled, she remained until the very day before her death mentally alert and interested in current affairs. She was justifiably proud of her handwriting and wrote many letters to Fraser during his frequent trips to Canada, Florida and other places; most of these witnesses testify to her great solicitude for his care and comfort. This evidence tends to indicate that decedent was remarkably active mentally for one of her years, and that she possessed deep and genuine affection for Fraser. It does not prove, however, that the love and affection she bore him, and which undoubtedly motivated her in the gifts to him, were not aroused by his crafty and unworthy methods, or that they were not the means by which Fraser dominated her will and secured her property. All the circumstances point to the conclusion that this was indeed the case.

Within a few weeks after their first meeting, Fraser had become decedent's daily companion and an inhabitant of her home. It is impossible from the evidence to

believe that this ripening of a bare acquaintance into intimacy between a young man and an aged spinster, was not actively sought and engineered by him. Prior to this time decedent always had been careful and prudent with respect to her property and financial affairs, being in no sense extravagant and parting with nothing of substantial value. However, as Fraser's hold upon her affections grew, he secured money and property from her in ever increasing amounts, until at the time of her death he had obtained over two-thirds of the principal of her estate. In the last month of her life she set up a trust fund of $35,000 for him, and gave him outright $10,000 in bonds. During the entire period of their association Fraser received from decedent in traceable transactions, over $20,000 a year in money, securities and real estate. Moreover, his bank accounts show additional deposits of almost $30,000, although he had no other source of income except from Miss McCalla. Not only did she buy for him and place in his name a house in the country and pay all of the expense of rebuilding it after it was destroyed by fire, but she even deeded to him her own home in Philadelphia.

The rapidity with which Fraser despoiled his benefactress demonstrates beyond question that he lacked any sincere regard for her, and that his appearance of affection was but artful simulation. The ease with which decedent surrendered her property to him after a lifetime of prudent conservation of her estate would seem to be explainable only upon the ground that after many years of loneliness she was a ready victim of the flattery and attention with which he masked his cupidity, and that thereby her will was entirely subjugated to his. So far from negativing the existence of undue influence, the facts of the case indicate that Fraser obtained his gifts from decedent by deception and overreaching, and by a shocking abuse of her love, affection and confidence. Certainly we cannot say that the evidence does not support the findings in this regard.

One further question requires to be noticed. At the hearings plaintiffs contended that two alleged codicils to decedent's will were forgeries, and presented evidence to this effect as further proof of Fraser's fraudulent conduct. The chancellor and court below accepted plaintiffs' testimony in this regard and found accordingly. Appellant contends that this was error. We do not deem it necessary to decide this question. The matter will be determined in the proceedings relative to the probate of the will before the Orphans' Court, where it will be heard de novo. Even if the chancellor erred in finding the codicils to have been forged, the record amply supports the conclusion of a confidential relation, and of undue influence, upon which the decree depends. The error, if any, did not therefore prejudice appellant.

The decree of the court below is affirmed, costs to be paid by appellant.