Young et al., Appellants, *v.* Kaye.

336

Argued October 6, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused August 10, 1971.

*John C. Bane, Jr.*, with him *Roger C. Wiegand*, and *Reed, Smith, Shaw & McClay*, for appellants.

*Philip F. Jacobus*, for appellees.

*Anthony H. Chambers*, with him *Chambers & Crisman*, for appellees.

Opinion by Mr. Justice Roberts, June 28, 1971:

This appeal arises out of an action in equity in the Court of Common Pleas of McKean County to quiet title to 10,000 shares of stock of the Kinzua Oil and Gas Corporation, suit having been brought by appellants Fred Young and the guardian of his wife Mercedes.

It is conceded by all that the Youngs owned the stock in question until late 1966 or early 1967, at which time Fred Young on his own behalf and on behalf of his wife Mercedes caused to be executed a certificate for the 10,000 shares registered in the name of appellee Melvin Brooks. In December of that year, Brooks sold the same stock to appellee Traner Associates and Company for the sum of $50,000.

The two issues posed by this appeal are whether the stock transfer from the Youngs to Brooks is voidable because of a confidential relationship between Brooks and Young and, if so, whether Traner Associates nevertheless holds good title to the stock by virtue of the circumstances in which it acquired the stock from Brooks. Having reviewed this voluminous record, we hold that the Young-Brooks transfer is voidable and that the Youngs have a claim to the stock superior to that of Traner Associates.

## I. The Young-Brooks Transfer

Kinzua Oil and Gas Corporation, a Pennsylvania Corporation with a registered office in Erie, Pennsylvania and a general business office in Bradford, Pennsylvania, was incorporated in 1942 by Arthur Stone Dewing of Newton, Massachusetts, Charles C. Davis of Kane, Pennsylvania, and appellant Fred Young. The authorized capital stock of the corporation was and is 10,000 shares of common stock, all of which were issued initially to Dewing and members of his family,

except for one share each to the other two incorporators. On or about July 19, 1960, the Dewing family sold its entire interest in Kinzua, 9,998 shares, to Fred and Mercedes Young for $10,000. At approximately the same time Arthur Dewing resigned as president of Kinzua, and Fred Young assumed that office as well as the office of treasurer. Although a man of sound mind, Fred Young was then in his seventies.

Primarily a holding company, Kinzua's principal asset is 1143 of the 1500 authorized and outstanding shares of the preferred stock of Kane Gas, Light and Heating Company, a public utility corporation supplying natural gas to the public in and around Kane, Pennsylvania. Because of certain defaults in the payment of dividends on the Kane Gas preferred stock, Kinzua has voting control of Kane Gas. From 1960 to 1967, Fred Young was president of Kane Gas as well as Kinzua, and both companies shared common offices in Kane, Pennsylvania.

Prior to his association with Fred Young and apparently unknown to Young, appellee Brooks had been convicted of the federal crime of stealing checks from the mail entrusted to his custody as a United States mail carrier. Beginning in 1962, he entered the employ of Kane Gas on a part-time basis as an accountant and "tax consultant" and in these capacities assisted and advised George Lupfer, the assistant treasurer of Kane Gas, in preparing the consolidated federal income tax returns for Kane Gas and its subsidiaries. In addition Brooks did much of the accounting and all of the federal tax work for Kinzua from 1962 until late in 1967, throughout which period he had free access to all of Kinzua's books, records, minute books, stock records and files.

Until the present controversy Young considered Brooks a friend and trustworthy advisor in tax and ac-

counting matters. The trust and confidence placed in Brooks is exemplified by his practice of routinely preparing and submitting letters, income tax returns, financial statements and various other papers which Young relied upon and signed without question. In addition to corporate business, Brooks also frequently consulted with Young about Young's personal tax problems, and the latter often relied and acted upon the information so obtained.

The specific series of events giving rise to the present appeal was precipitated initially by an agent of the Internal Revenue Service named Dushaw who appeared at the common offices of Kinzua and Kane Gas late in 1966 with authority to audit the financial records underlying the federal tax returns of both corporations. Under instructions from Young, Brooks worked very closely with Dushaw for the ensuing several months, and on March 13, 1967, after the conclusion of the tax audit, the Internal Revenue Service District Director issued a deficiency assessment against Kinzua for $11,-814.63, a sum representing additional income tax allegedly owed by Kinzua for the year 1960. According to Brooks, Dushaw informed him in the course of one of their private meetings that similar assessments would probably be levied against Kinzua for the years 1961-1967 and that the holder of record of the Kinzua stock at the date of any assessment against Kinzua would be personally liable to pay that particular assessment.

Brooks related this information to Young and, according to Young, advised him that the assessment against Kinzua could be successfully defeated by placing the Kinzua stock in the name of a nominee "for tax purposes only." Young testified further that he relied upon this advice and attempted to register his stock

and that of his wife[1] in the name of Brooks and Grace Mattison, Kinzua's corporate secretary, by placing 5,000 shares in the name of each. Miss Mattison at first agreed to this arrangement but later complained that she could not permit the registration in her name of stock belonging to the Youngs, whereupon Brooks offered "to take the 5,000 shares off Miss Mattison's hands." Thereafter two 5,000 share certificates, each in the name of Brooks, were prepared and signed.

Brooks' version of the Kinzua stock transfer is much different. According to him, Young's concern upon being informed of his potential personal liability for any tax assessments against Kinzua resulted in a series of discussions culminating in the following oral contract: Young agreed to transfer to Kinzua a valuable oil lease known as the Gavin lease and to transfer to Brooks his and his wife's 10,000 shares of Kinzua stock, in return for which Brooks promised to pay any tax liability resulting from any deficiency assessments levied against Kinzua.

The only other documentary evidence relating to the Kinzua stock transfer is a written memorandum dated March 30, 1967 and signed by both Brooks and Young. That memorandum reads in material part as follows: "Fred W. Young of Erie, Pa., and Melvin J. Brooks of Salamanca, New York, have caused their signatures to be affixed to this memorandum as evidence that the said Fred W. Young has transferred unto the said Melvin J. Brooks any interest that he might have in the Kinzua Oil and Gas Corporation for good and valuable consideration, receipt whereof is hereby acknowledged and in further consideration of the promise of the said Melvin J. Brooks to assume and pay a certain undetermined income tax liability which the parties under-

---

[1] The trial court found as a fact that Fred Young had authority to act for his wife Mercedes Young.

stand and expect will be assessed against the said Kinzua Oil and Gas Corporation in an amount of approximately Ten Thousand Dollars ($10,000.00), be the same more or less."

After trial of this matter, the Court of Common Pleas of McKean County dismissed the Youngs' complaint. While admitting that certain facts of the instant case were "greatly troubling", such as the prior criminal record of certain of the appellees,[2] the court chose to credit Brooks' testimony rather than that offered by Young and having made that finding reasoned as follows: "This court rejects the plaintiffs' contention that they were victims of Brooks' fraud, but rather concludes that Fred W. Young, acting for both himself and for Mercedes Young, his wife, for whom he had authority to act, made a binding contract in the fall of 1966 with Melvin J. Brooks for the sale of Kinzua Oil and Gas Corporation, and that the same was ratified by a subsequent written agreement under date of March 30, 1967 which was properly executed and supported by consideration. The burden of proof to establish fraud rested on the plaintiffs, and they have not met that burden by the evidence presented in this case. . . ."

Recognizing that the trier of fact is uniquely situated to best resolve questions of credibility, we cannot conclude that the trial court's decision to believe Brooks' "contract" theory of the stock transfer rather

---

[2] As mentioned above, appellee Brooks had been convicted of stealing checks from the United States mail. Two other appellees also share a criminal record: Appellee John Kaye had in the past been convicted for obtaining money under false pretenses and uttering counterfeit bonds, and appellee Ralph Tudesco had been convicted of obtaining money under false pretenses. Kaye and Tudesco were involved in Brooks' sale of Kinzua to Traner Associates. See pp. 8-9 infra.

than Young's "nominee" theory of the transfer was clearly erroneous.

Moreover, the trial court quite correctly stated the general rule that a party seeking to avoid or undo a contract on the basis of fraud bears the burden of proving fraud. See, e.g., *Aliquippa National Bank v. Harvey*, 340 Pa. 223, 16 A. 2d 409 (1940). This general rule, however, presupposes contracting parties legally free to deal at arm's length, and we believe that on this record Brooks was bound to a much higher duty in his dealings with Young.

When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage. *McCown v. Fraser*, 327 Pa. 561, 192 Atl. 674 (1937); *Null's Estate*, 302 Pa. 64, 153 Atl. 137 (1930); *Popovitch v. Kasperlik*, 70 F. Supp. 376 (W.D. Pa. 1947); see generally 17 C.J.S. *Contracts* §184 (1963). This well settled doctrine, founded on strong considerations of public policy, renders inapplicable the general rule requiring an affirmative showing of fraud. To the contrary, transactions between persons occupying a confidential relationship are prima facie voidable, and the party seeking to benefit from such a transaction must demonstrate that it was "fair, conscientious and beyond the reach of suspicion." *Leedom v. Palmer*, 274 Pa. 22, 25, 117 Atl. 410, 411 (1922). See also *McCown v. Fraser*, supra at 564, 192 Atl. at 676.

"It is impossible to define precisely what constitutes a confidential relation." *McCown v. Fraser*, supra, 327 Pa. at 564, 192 Atl. at 676. It is not restricted to any specific association of persons nor confined to technical cases of fiduciary relationship but is

deemed to exist whenever the relative position of the parties is such that one has power and means to take advantage of or exercise undue influence over the other. *McCown v. Fraser,* supra; *Longenecker v. Zion Evangelical Lutheran Church,* 200 Pa. 567, 50 Atl. 244 (1901). Accordingly, a confidential relationship generally exists "between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent." *Leedom v. Palmer,* supra, 274 Pa. at 25, 117 Atl. at 412.

Turning now to the facts of the present case, our reading of the record convinces us that a confidential relationship did indeed exist between Brooks and Young. Though a man of sound mind, Young was an octogenarian at the time of the disputed stock transfer. He possessed no apparent knowledge of the intricacies of the federal personal and corporate income tax laws and had no independent advice on such matters, relying instead upon the trusted advice of Brooks, his "tax consultant". Moreover, Young often signed without question tax and other financial documents prepared by Brooks. The contract for the sale of Kinzua to Brooks was motivated by tax considerations brought to Young's attention by Brooks and the consideration given by Brooks was the assumption of an alleged tax liability. In these circumstances, there can be little doubt that Brooks was in a position to take advantage of Young.

Having concluded that Brooks and Young occupied a position of confidential relationship, there remains to be decided whether the record contains evidence that the transfer was "fair, conscientious and beyond the reach of suspicion." As stated above, the Youngs purchased the Kinzua stock in 1960 for $10,000, and in 1967 Fred Young donated to the corporation a valuable oil lease and transferred all of the capital stock to

Brooks. Several months later Brooks resold the stock to a third party, Traner Associates, for $50,000 plus Traner's promise to indemnify Brooks up to $60,000 for any personal tax liability accruing to Brooks as a result of any tax assessments against Kinzua. The stock transfer from Young to Brooks was motivated by considerations of tax avoidance, and Young had no independent advice on the matter. To date, *no one has ever received a tax assessment imposing personal liability of Kinzua's taxes.* It would strain credulity to characterize this set of circumstances as fair and beyond the reach of suspicion, and we therefore hold the Young-Brooks transfer voidable.

We must next consider whether Traner Associates has a claim to the Kinzua stock superior to that of Young.

## II. The Brooks-Traner Associates Transfer

In the early part of December, 1967, Brooks became acquainted with appellee John Kaye and met with him in Bradford, Pennsylvania to discuss the possible sale of Kinzua. Kaye, like Brooks, possesses a criminal record, having in the past been convicted and sentenced for obtaining money under false pretenses and uttering counterfeit bonds.

Shortly after this meeting Kaye communicated with Harry Albert, a member of the New York bar and Kaye's former attorney. As a result of this communication, Albert journeyed to Bradford in order to sell and deliver to Kaye all of the stock of Traner Associates and Company, an inactive corporate shell belonging to Albert and his wife. After consummating the sale, Albert was retained by the new owners of Traner Associates (Kaye, appellee Ralph Tudesco and others) to evaluate a proposal that Traner Associates acquire Kinzua from Brooks.

A series of meetings was held at a local motel in Bradford. Little is known of what transpired there, but, in any event, on or about December 15, 1967, Brooks and Traner Associates entered into a written contract for the sale of the Kinzua stock. In attendance at the execution of the agreement were Brooks, Kaye, Tudesco, and appellee Anthony Chambers, a local attorney representing Traner Associates. Under the terms of the contract, Traner Associates was to pay Brooks $50,000 over a period of four years and to indemnify Brooks up to $60,000 for any tax liability against Kinzua for which Brooks might be personally responsible.

The legal norms applicable to the resolution of competing claims to interests in securities are contained in Article 8 of the Uniform Commercial Code, Act of April 6, 1953, P. L. 3, §8-101 et seq., as reenacted October 2, 1959, P. L. 1023, §8, 12A P.S. §8-101 et seq. Section 8-301 codifies the common law general rule that a purchaser of securities acquires only the rights of his transferor but adds the qualification that "[a] bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim." Thus, Traner Associates can establish clear title to the Kinzua stock free of Young's adverse claim *only* if it qualifies as a "bona fide purchaser."

The status of "bona fide purchaser" is defined in Section 8-302 as: ". . . a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or endorsed to him in blank." Traner Associates clearly purchased the Kinzua stock for value and took delivery of the same. The record is largely silent, however, as to whether or not it purchased in good faith and without notice of Young's adverse claim. Thus arises the crucial question: in a si-

lent record case, does the adverse claimant bear the burden of proving that the holder of the security is not a bona fide purchaser, or, to the contrary, must the holder affirmatively demonstrate that he is a bona fide purchaser? We believe the burden of proof rests upon the holder in such a situation.

Article 3 of the Uniform Commercial Code deals with negotiable instruments, and Section 3-307(3) of that Article provides: "(3) After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course." Under Section 3-307(3), if the adverse claimant of a negotiable instrument proves that he only transferred voidable title, the holder of the instrument must prove that he or the person under whom he claims is a holder in due course. This rule reflects the prior law. See Section 59 of the Uniform Negotiable Instruments Law (now repealed); *Brubaker v. Berks County*, 381 Pa. 157, 112 A. 2d 620 (1955); *Bank of America v. Rocco*, 241 F. 2d 455 (3d Cir. 1957).

Returning now to Article 8 of the Code dealing with investment securities, we find that Section 8-105 as originally drafted and adopted by the Legislature of this Commonwealth provided that:

"(1) Securities governed by this Article are negotiable instruments.

"(2) In any action on a security the rules relating to proof of signatures and to burden of proof after signatures are admitted or established, *shall be the same as in actions on commercial paper (Section 3-307)*." (Emphasis added.)

Thus, the Code as originally drafted and adopted was quite clear: just as a holder of a negotiable instrument must prove that he holds in due course once a

defect in his title is shown to exist, so too did a holder of a security have to demonstrate affirmatively his status as a bona fide purchaser once a defect in his title was shown. Section 8-105, however, was amended and reenacted by the Act of October 2, 1959, P. L. 1023, §8, effective January 1, 1960, and Traner Associates argues that the former rule pertaining to burden of proof is no longer applicable. The amended and reenacted version of Section 8-105 now reads as follows:

"(1) Securities governed by this Article are negotiable instruments.

"(2) In any action on a security (a) unless specifically denied in the pleadings, each signature on the security or in a necessary endorsement is admitted; (b) when the effectiveness of a signature is put in issue the burden of establishing it is on the party claiming under the signature but the signature is presumed to be genuine or authorized; (c) when signatures are admitted or established production of the instrument entitles a holder to recover on it unless the defendant establishes a defense or defect going to the validity of the security; and (d) after it is shown that a defense or defect exists the plaintiff has the burden of establishing that he or some person under whom he claims is a person against whom the defense or defect is ineffective."

As is readily apparent, the new and present version of Section 8-105 no longer makes any express reference to the burden of proof rules contained in Section 3-307, and subsection (d) speaks only of the "plaintiff" having the burden of demonstrating that a defect or defense is ineffective against him. Accordingly, Traner Associates argues that since it is a "defendant" in the instant action, Section 8-105 is inapplicable and it does not have the burden of proving that it is a bona fide purchaser. This argument is defective in two respects.

In the first place, we do not believe that the Commissioners intended such a drastic change in the law by mere omission and implication. That no such change was intended is confirmed by a comparison of the text of the official comment to the original version of Section 8-105 with the text of the official comment accompanying the amended Section 8-105.[3] The original comment ended by declaring that "by subsection (2) of this section the particular rules stated in Section 3-307 for the negotiable instruments governed by Article 3 are made applicable also to securities." The present comment to amended Section 8-105 contains the practically identical language that "by subsection (2) of this section the particular rules stated in Section 3-307 for the negotiable instruments governed by Article 3 are adapted to securities." In these circumstances we do not believe that amended Section 8-105 changes the law relating to burden of proof.

Moreover, even if we were to accept Traner Associates' interpretation of the present Section 8-105, the most that would be established would be that the Code does not presently speak to the issue of who bears the burden of proving whether or not the holder of a security is a bona fide purchaser, and in the absence of a specific statutory directive we would apply our general common law rule of evidence that "[i]f the existence or nonexistence of a fact can be demonstrated by one party to a controversy much more easily than by the other party, the burden of proof may be placed on

---

[3] It is settled in this Commonwealth that the official comments of a commission drafting legislation may be given weight in the construction of a statute. See *Tarlo's Estate*, 315 Pa. 321, 172 Atl. 139 (1934) (construing Intestate Act of 1917) ; *Miles's Estate*, 272 Pa. 329, 116 Atl. 300 (1922). See also Statutory Construction Act, Act of May 28, 1937, P. L. 1019, art. IV, §51, 46 P.S. §551 (reference to legislative history).

that party who can discharge it most easily." *Barrett v. Otis Elevator Company*, 431 Pa. 446, 452-53, 246 A. 2d 668, 672 (1968) (citing Wigmore). It is manifest that in the vast majority of cases it will be much easier for the holder of a security to prove that he is a bona fide purchaser than for an adverse claimant to prove otherwise. For this reason, even if Section 8-105 were interpreted to be inapplicable to this burden of proof issue, we would nevertheless place that burden upon the one claiming the status of bona fide purchaser.

As Traner Associates has not affirmatively demonstrated that it purchased the Kinzua stock in good faith and without notice of Young's adverse claim, Traner cannot be deemed a bona fide purchaser and title to the stock must revert to the Youngs.

The decree of the Court of Common Pleas of Mc-Kean County is reversed and the record remanded for proceedings consistent with this opinion.

Each party to bear own costs.

Mr. Chief Justice BELL concurs in the result.

Mr. Justice COHEN took no part in the decision of this case.