Yohn Estate

M. *Paul Smith* and *John S. Halsted,* for accountant.

*James R. Ledwith* and *Francis M. Richards,* for John P. Yohn.

*Jerome B. Apfel* and *Bernard Glassman,* for testamentary trustees.

*John R. Suria,* for First Pa. Bk. N.A., individually.

ADJUDICATION BY SATTERTHWAITE, J., JULY 3, 1980:

* * * Decedent died August 27, 1979, leaving a will whereby he gave all tangible personalty and one-half of his residuary estate outright to his wife Anna R. Yohn (to whom he had been married since January 16, 1975), and the other half of the residue to First Pennsylvania Bank and David Yohn in trust to pay income to his son (by a prior marriage) John Philip Yohn for life with remainders to grandchildren David Yohn and Carol Yohn Stanton. He named his wife Anna R. Yohn as the sole executrix.

The text or body of the will had been written out by decedent's wife upon dictation thereof by counsel via telephone. Decedent executed the writing so prepared by affixing his signature thereto on July 16, 1979. On the same day, he executed a comprehensive power of attorney, likewise prepared by counsel, which ran to his wife Anna R. Yohn, whereby he authorized her

> "to perform all acts concerning my affairs . . . in my attorney's absolute discretion, as fully as I could do if personally present, including . . . (inter alia) . . . (to) endorse all checks and instruments payable to me and deposit and withdraw all moneys, checks and instruments to which I may be entitled, in my name or my attorney's name or our joint names in all financial institutions . . ."

Still further on that day, he also executed a printed form of power of attorney, again in favor of his wife, specifically authorizing her to draw on his checking account in First Pennsylvania Bank N.A., such form being provided and required by said bank when an attorney-in-fact may be provided for. He had earlier, on May 17, 1979, leased a safe deposit box at the Strafford branch of the same bank, registering the same in the joint names of himself and Anna R. Yohn with right of survivorship.

On August 10, 1979, there matured and was credited to decedent's individual checking account a money market certificate or certificate of deposit which had theretofore been issued by said First Pennsylvania Bank N.A., registered and outstanding in decedent's name alone, the matured proceeds being in the amount of $140,163.85. On the same day, the bank issued a new ("rolled over") certificate of deposit for the full amount of such proceeds, registering the same, as requested by Mrs. Yohn as attorney-in-fact for decedent, in the joint names of "John A. Yohn or Anna R. Yohn."

On August 17, 1979, another such money market certificate of said bank, likewise theretofore registered in decedent's name alone, matured and was "rolled over" in the full amount of the proceeds of $239,140. The new certificate therefor was issued in the name of decedent alone, notwithstanding that Mrs. Yohn, as attorney-in-fact, had given similar instructions that it also be issued in the joint names of decedent and herself. Such instructions had not been followed in this instance because the branch bank officer desired to obtain advice from the bank's legal counsel as to the efficacy of the power of attorney to accomplish such modified registration. It was stipulated, however, that such legal counsel, had he been called as a witness, would have testified that on August 20, 1979 (other evidence would indicate that the correct date was August 24th) he had advised the branch bank officer that, so far as the bank was concerned, such joint registration would be approved. Although the branch bank officer had thereupon requested the central office of the bank to correct the matter, and no other impediment thereto appeared, an amended certificate to effectuate the joint registration requested was not in fact issued prior to decedent's death on August 27, 1979.

Decedent's situation, state of health, and other surrounding circumstances on July 16, 1979 when he executed his will and the powers of attorney, and thereafter to the date of his death forty-two days later, do not appear in the record except in very minor part. He was 85 years of age and, so far as the record discloses, was in full possession of his mental faculties during this entire period. He resided during this interval at his summer or vacation home in Stone Harbor, N.J. and ap-

parently executed said documents there. Between June 27, 1979 and his death, some 29 checks signed by him personally cleared and were charged to his checking account, the latest dated August 23rd. He had last had access to the safe deposit box at the Strafford branch office of the bank on June 8, 1979, and Mrs. Yohn had never entered the same until August 28th, the day after his death. The record does not disclose the situation and custody of the two maturing money market certificates or the circumstances under which, or by whom, or even if and when they were surrendered to the bank upon maturity.

Decedent died on August 27, 1979 at a hospital in Cape May County, N.J., and, according to a copy of the death certificate in the register's file, the immediate cause of death was a cardio-respiratory failure due to or as a consequence of "severe cardiovascular disease" of unstated prior duration. There is no evidence whatsoever in the record that decedent either did or did not know of, or either had or had not specifically requested, the reissuance of the respective money market certificates in the joint names of himself and his wife.

In the inventory filed, and also in the within accounting presently before the court for audit, Mrs. Yohn as executrix has charged herself with estate assets (substantially all in bank checking and saving accounts and U.S. Treasury bonds) aggregating $515,718.53. In addition, in both documents, she set forth, as items entered short and not carried into the totals, inter alia, the two money market certificates mentioned, plus items of tangible personalty situated in the "homestead" property valued at $13,797.50, all of which she would exclude from testamentary assets and which she claimed individually as surviving tenant by the entireties.

Objections to the inventory and to the accounting were filed by First Pennsylvania Bank N.A. and David Yohn, as testamentary trustees (and the latter as an individual beneficiary in remainder). The first and second of these challenged accountant's failure to include the two money market certificates as assets of the estate, denying their status as entireties property.

If decedent himself had personally placed the new or "rolled

over" certificates in the joint names of himself and his wife, and no attorney-in-fact had been involved in the transactions, an estate by the entireties in each certificate with the consequent incident of survivorship would prima facie have been created by way of gift, notwithstanding that the funds had theretofore been solely decedent's and that decedent had died so shortly thereafter: *Holmes Est.*, 414 Pa. 403; *Carnevalino Est.*, 435 Pa. 366; compare *Young Est.*, 480 Pa. 580; *Lux Est.*, 480 Pa. 256; Section 6304 (a) of the Probate, Estates and Fiduciaries Code, as added by the Act of July 9, 1976, P.L. 547; 20 Pa. C.S. 6304 (a). Under such circumstances, the burden to show any contrary intent would have rested upon those so contending.

Moreover, there can be no serious contention that Anna R. Yohn was acting beyond the literal scope of the authority conferred by the comprehensive power of attorney, which expressly authorized her to "deposit and withdraw all moneys, checks and instruments to which I may be entitled," not only in decedent's name, but also in "our joint names in all financial institutions." Furthermore, it is of no present significance that the $231,140 certificate had not been amended or corrected prior to decedent's death to comply with Mrs. Yohn's directions as attorney-in-fact that the same be registered in joint names. It is unchallenged in the record that, following bank counsel's affirmative response to the branch bank officer's inquiry as to the permissible scope of her authority under the power of attorney, it was only a ministerial matter to have effectuated such registration. Equity will regard that as done which ought to have been done. Both certificates should therefore be considered as though both had been in the joint names of decedent and his wife at the time of his death.

It is the opinion of the auditing judge, however, that the additional circumstance presented here, to wit, the fact that the ostensible joint or entireties estate in these certificates was created by acts of the spouse-joint tenant herself as agent for the husband-prior sole owner, overcomes the prima facies of the apparent entireties holdings at decedent's death, and shifts the burden of proof to the spouse to establish the bona fides of the transfers.

The controlling legal principles are summarized in *Young v. Kaye,* 443 Pa. 335, 342:

> "When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage: (citing authorities) . . . Transactions between persons occupying a confidential relationship are prima facie voidable, and the party seeking to benefit from such a transaction must demonstrate that it was 'fair, conscientious and beyond the reach of suspicion.' (citing authorities)"

Compare *Dzierski Est.,* 449 Pa. 285, 289. See, also, *Scott Est.,* 455 Pa. 429.

The auditing judge believes that Mrs. Yohn, even on this sketchy record, as a matter of law appears to have stood in legal contemplation in a confidential relationship to her husband at the time of the "roll over" of each of the money market certificates. She was his wife with whom he resided in a domestic relationship which did not include other members of his family. She had been at least the amanuensis by which his last will had been reduced to writing. She had had, or at least assumed, the responsibility of completing the bank's records or signature cards in connection with decedent's checking account: see the correspondence from bank personnel addressed to her (not to decedent) mailed July 10, 1979 and August 6, 1979 (Exhibits A-4 and A-5). And, most importantly, she was his designated agent and attorney-in-fact with almost unlimited discretionary powers under the comprehensive letters of attorney of July 16, 1979.

A further quotation from *Young v. Kaye, supra,* 443 Pa. at 342-343, summarizes the controlling standards:

> " 'It is impossible to define precisely what constitutes a confidential relationship.' *McCown v. Fraser,* supra, 327 Pa. at 564, 192 Atl. at 676. It is not restricted to any specific association of persons nor confined to technical cases of fiduciary relationship, but is deemed to exist whenever the relative positions of the parties is such *that one has power and means to take advantage* of or exercise undue influence over *the other. McCown v. Fraser,* supra; *Longenecker v. Zion Evangelical Lutheran Church,* 200 Pa. 567, 50 Atl. 244 (1901). Accordingly, a confidential relationship generally exists 'between trustee and cestui que trust, guardian and ward,

attorney and client, *and principal and agent.'* *Leedom v. Palmer,* supra, 274 Pa. at 25, 117 Atl. at 412." (Emphasis supplied.)

In *Ringer, Admrx v. Finfrock,* 340 Pa. 458, 461, it was stated that a confidential relationship would exist as a matter of law in certain recognized fiduciary relationships, and there can be no doubt but that an agent stands in a fiduciary relationship to his or her principal.

It is of no significance here that there was no evidence of undue influence or other overreaching as a matter of fact. Such may actually not have been present. But under the precedents it is the burden of the agent affirmatively so to demonstrate as a matter of public policy. Moreover, the requirement of evidence of at least some impairment of mental faculties, a necessary element in will contests involving alleged abuse of a confidential relationship, does not obtain in litigation concerned with intervivos transfers attacked on that ground: see *Longworth Est.,* 28 FIDUC. REP. 215, 218, and cases therein cited. It is enough to shift the burden of proof under these precedents that the *mere opportunity* for abuse of the fiduciary relationship has existed; proof of an actual overreaching is not required.

Since Mrs. Yohn has presented no evidence (and none otherwise appeared) to meet the burden which, the auditing judge believes, would rest upon her in light of these considerations, the objectors' first and second objections must be sustained. Accountant is accordingly hereby directed to include and account for the two subject money market certificates as the separate property of the decedent at the time of his death and as consequent testamentary assets of his estate, together with any earnings attributable thereto. * * *