## Floyd v. Clearfield

48

*Alan M. White* for plaintiffs.

HERRON, *J.,* October 8, 2001—This opinion addresses the motion of plaintiffs Gale Floyd and Luz Ortiz to certify a class of homeowners who paid defendants

Jules Clearfield and/or First Clearfield Fund Inc. a mortgage broker fee between February 21, 1995 and February 21, 2001. Because the plaintiffs' claims cannot be resolved fairly and efficiently by a class action and do not present predominating common questions of fact and law, the motion is denied.

## FINDINGS OF FACT

(1) Plaintiff Gale Floyd is an individual residing at 2513 North 19th Street, Philadelphia, Pennsylvania. Complaint at ¶1.

(2) Plaintiff Luz Ortiz is an individual residing at 5460 North Warnock Street, Philadelphia, Pennsylvania. Complaint at ¶2.

(3) Defendant Jules Clearfield is a loan broker with a place of business at 1801 JFK Boulevard, Philadelphia, Pennsylvania. Complaint at ¶¶3, 5.

(4) Defendant First Clearfield Fund Inc. is a Pennsylvania corporation with a place of business at 1801 JFK Boulevard, Philadelphia, Pennsylvania. Complaint at ¶4. Clearfield operates his loan brokerage business through the Fund. *Id.* at ¶5.

(5) Prior to October 1996, Floyd had two mortgages on her home. The first mortgage had an interest rate of less than 10 percent and monthly payments of $143, and the second mortgage had an interest rate of less than 10 percent and monthly payments of $189. Complaint at ¶15.

(6) In 1996, Floyd decided to convert the oil heater in her home to gas. Complaint at ¶7. Bryant Plumbing, a

home improvement contractor, offered to install the gas heater for $2,500 and to obtain financing for its work. *Id.* Floyd told Bryant that she intended to pay $1,000 in cash and to finance the $1,500 balance. *Id.*

(7) Without informing Floyd, Bryant contacted Clearfield and asked him to obtain financing for the work at Floyd's home. Complaint at ¶8.

(8) According to the complaint, the defendants and United Companies Lending Corporation, a subprime mortgage lender, had an agreement pursuant to which the defendants would submit mortgage loan applications to United. Complaint at ¶11. United would then include a broker's fee specified by the defendants in the disbursements from any loan granted to the borrower. *Id.*

(9) Clearfield prepared a written loan application, purportedly on Floyd's behalf, and transmitted it to United. Complaint at ¶8. The application set forth the value of Floyd's contract with Bryant, a credit report and an alleged request from Floyd for a $1,400 loan for home improvements. *Id.*

(10) The terms and amount of the loan requested in the application were substantially different from those desired by Floyd. Complaint at ¶14.

(11) In the course of his contacts with United, Clearfield represented that he was Floyd's agent. Complaint at ¶10.

(12) At no time prior to his submitting the application did Clearfield have any contact with Floyd, obtain her permission to represent her or provide her with any written broker agreement or notice of her right to cancel such agreement. Complaint at ¶9.

(13) Floyd's loan with United closed on October 28, 1996. Complaint at ¶12. Floyd's loan, which refinanced the mortgages and included the home improvements loan, had an interest rate of 12 percent (15 percent annual percentage rate), required monthly payments of $403 for 15 years and charged lender fees, broker fees and credit insurance premiums in excess of $7,000. *Id.* at ¶15.

(14) Floyd's loan required monthly payments of nearly half of her monthly income and included $2,429.62 for credit life insurance for 15 years, something Floyd neither requested nor wanted.[1] Complaint at ¶16. The broker's fee amounted to nearly 90 percent of the amount she sought to finance, and her total payments over 30 years were increased by more than $12,000 over the mortgages' payments. *Id.* The complaint asserts that these conditions made Floyd's loan unsuitable for her. *Id.*

(15) Neither defendant provided Floyd with notice of her three-day right to cancel any broker's agreement with the defendants or notified Floyd that she would be charged a 5 percent broker's fee. Complaint at ¶12.

(16) In July 1998, Ortiz hired Robert Krevolin Builders Inc. to do some work on her home. Complaint at ¶19. The agreement to do this work was conditioned on finding financing. *Id.*

(17) Ortiz is a low-income, unsophisticated consumer who had never participated in a consumer loan transaction prior to July 1998. Complaint at ¶35. Accordingly, Ortiz provided Krevolin with information regarding her income and liabilities. *Id.* at ¶19. Krevolin, in turn, con-

---

1. Floyd already had a $9,000 life insurance policy through her employer. Complaint at ¶16.

tacted Clearfield, with whom it maintained a close business relationship. *Id.* at ¶20.

(18) The defendants had an agreement with Equicredit Corp. under which the plaintiffs would submit home equity loan applications and would be paid a broker's fee from the loan disbursements. Complaint at ¶30.

(19) On July 13, 1998, the defendants sent Ortiz a letter advising her that they had obtained a "commitment approval" for a fixed rate, 15-year loan at 9.4 percent interest (July loan) with Equicredit. Complaint at ¶21. According to the terms of Ortiz' loan, she would be provided with $30,900, itemized as $28,000 for Krevolin and $2,900 for cash for Ortiz, and would repay the loan in monthly payments of $374. *Id.*

(20) Enclosed with the letter describing July loan was a form authorizing payment of a fee of "10 percent of the amount financed" on a loan of $36,000 to the Fund. Complaint at ¶22.

(21) When Ortiz did not respond to the July 13, 1998 letter due to concerns that she could not afford the July loan, Krevolin and Clearfield repeatedly called her and encouraged her to agree to the July loan. Complaint at ¶¶23-24. Sometime in the fall or winter of 1998, Ortiz received a visit from Michael Borso, a loan officer with a lender named Sterling Lending Corp. *Id.* at ¶25. Borso had received Ortiz' name from Clearfield, with whom he had a long-standing business relationship. *Id.*

(22) Ortiz eventually agreed to go ahead with the July loan, and the parties conducted a settlement on December 16, 1998. Complaint at ¶26. Sterling then assigned the December loan to Equicredit. *Id.* at ¶28.

(23) The loan covered by the settlement on December 16, 1998 (December loan) differed from the July loan in a number of ways. Complaint at ¶27. The December loan required monthly payments of $384 and had a term of 20 years, a principal of $36,000 and an annual percentage rate of 14.38 percent. *Id.* In addition, included in the December loan were more than 17 points in fees, consisting in part of a $2,470.75 fee for the Fund and a $2,830.75 "loan origination fee" for Sterling, the lender. *Id.* Only $24,500 of the December loan proceeds were made available for home improvements, and Ortiz received only $73 in cash, as opposed to the $2,900 she was promised. *Id.*

(24) At all times, the defendants represented to Equicredit and Sterling that they were Ortiz' agent. Complaint at ¶29.

(25) At no time prior to the closing on the December loan did the defendants disclose to Ortiz either the differences from the July loan or the fact that the defendants would receive a fee amounting to 11.5 percent of the December loan. Complaint at ¶31. No copies of any written authorizations Ortiz signed were provided to her. *Id.* In addition, neither defendant provided Ortiz with notice of her three-day right to cancel any broker's agreement with the defendants. *Id.* at ¶32.

(26) Ortiz began making payments on the December loan in January 1999, but Krevolin did not start work on her home until April 1999 and still has not completed the work agreed to. Complaint at ¶34.

(27) In the complaint, the plaintiffs assert four causes of action: fraud/breach of fiduciary duty; violations of

Pennsylvania's Unfair Trade Practices Consumer Protection Law;[2] absence of a valid broker's agreement; and violations of Pennsylvania's Credit Services Act (CSA).[3] Complaint at ¶¶37-49.

(28) In the motion, the plaintiffs seek certification of the following class:

"All homeowners who paid defendant Jules Clearfield and/or First Clearfield Fund Inc., a mortgage broker fee in the six-year period ending with the filing date of the instant action (February 21, 1995-February 21, 2001)."[4] Motion at introduction.

(29) The Pennsylvania Attorney General has filed an action titled *Commonwealth of Pennsylvania v. First Clearfield Fund* in the Federal Court for the Middle District of Pennsylvania. Motion exhibit E. Although this action presents claims against both defendants for violations of the UTPCPL and breach of fiduciary duty, it does not address the specific types of UTPCPL violations that the plaintiffs allege in the complaint. *Id.*

(30) The defendants have failed to enter an appearance in this matter and have not filed a response to the motion.

## DISCUSSION

The court finds the allegations in the complaint to be disturbing, to say the least. In essence, the defendants are accused of embarking on a scheme by which they

---

2. 73 Pa.C.S. §§201-1—201-9.3.
3. 73 Pa.C.S. §§2181-2192.
4. The class proposed by the plaintiffs is referred to as the "class."

have defrauded unsophisticated parties and bilked them out of hundreds of thousands of dollars. This conduct is reprehensible, and the defendants' failure to enter an appearance in this matter, let alone to submit any filings, no doubt has added to the plaintiffs' fury.

A motion for class certification, however, addresses not the substance of a plaintiff's claims but rather the procedure by which those claims should be addressed. This requires that the court focus on the factors set forth in the Pennsylvania Rules of Civil Procedure, not the defendants' specific behavior and legal violations, as alleged in the complaint. An examination of these factors reveals that this matter is not appropriate for resolution as a class action and that the motion must be denied.

The purpose behind allowing class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 397, 676 A.2d 1237, 1239 (1996) (citing *Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 231, 348 A.2d 734, 737 (1975)). See also, *Lilian v. Commonwealth,* 467 Pa. 15, 21, 354 A.2d 250, 253 (1976) ("The class action in Pennsylvania is a procedural device designed to promote efficiency and fairness in the handling of large numbers of similar claims"). For a suit to proceed as class action, Pa.R.C.P. 1702 requires that five criteria be met:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708." Pa.R.C.P. 1702.[5]

The burden of proving each of these elements is initially on the moving party, although this burden "is not heavy and is thus consistent with the policy that 'decisions in favor of maintaining a class action should be liberally made.' " *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (1985) (citing *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976)). Once the moving party has established that each of the elements is satisfied, "the class opponent shoulders the burden, which has shifted, of coming forward with contrary evidence challenging the prima facie case." *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449-50, 500 A.2d 1137, 1141 (1985).

In the instant case, the court is most concerned with the plaintiffs' ability to satisfy the second and fifth prongs. Specifically, the court is unconvinced that the complaint

---

5. It has been noted that "the requirements for class certification are closely interrelated and overlapping, . . . ." *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 130, 451 A.2d 451, 455 (1982).

presents questions of fact and law that are common to the class and that a class action is a fair and efficient method to address the plaintiffs' grievances.

A sustainable class action requires a plaintiff to show commonality of issues:

"The common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all. This is what gives the class action its legal viability. If . . . each question of disputed fact has a different origin, a different manner of proof and to which there are different defenses, we cannot consider them to be common questions of fact within the meaning of Pa.R.C.P. 1702." *Allegheny County Housing Auth. v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985). See also, *D'Amelio,* 347 Pa. Super. at 452, 500 A.2d at 1142 ("[w]hile the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding").

A court must also determine that a class action would constitute a fair and efficient method of resolving the issues in dispute, a conclusion that presupposes finding that "common questions of law or fact predominate over any question affecting only individual members." Pa.R.C.P. 1708.[6]

_____

6. Pennsylvania Rule of Civil Procedure 1708 requires a court to look at the following whether evaluating whether a class action is a fair and efficient method of adjudication:

"(1) whether common questions of law or fact predominate over any question affecting only individual members;

58

The plaintiffs contend that they have satisfied both the commonality and the fairness and efficiency requirements and point to paragraph 36(b) of the complaint, which lists numerous allegedly common questions of law and fact:

• Whether the advertising, form contract and standardized business practices employed by the defendants violate the UTPCPL;

• Whether the defendants constitute a "credit services organization" within the meaning of the Pennsylvania Credit Services Act;

• Whether the defendants' conduct violated the CSA;

---

"(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

"(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

"(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

"(ii) adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

"(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

"(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

"(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

"(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action." Pa.R.C.P. 1708(a).

• Whether the defendants failed to give consumers information required by the Pennsylvania CSA;

• Whether the defendants' advertising and sales practices accurately represent the services they provide;

• Whether the defendants' failure to have class members negotiate and execute a valid, written contract for broker services, specifying a loan amount, interest rate and broker's fee prior to rendering any services is an unfair and deceptive practice;

• Whether the defendants violated the UTPCPL by failing to provide a written contract and notice of cancellation rights;

• Whether the defendants had a fiduciary duty to disclose all important credit terms to members of the class;

• Whether the defendants violated the UTPCPL by providing loans at rates, terms and overall costs different from those agreed to; and

• Whether the defendants have engaged in an intentional scheme to defraud vulnerable consumers. Complaint at ¶36(b).

As noted by several Pennsylvania appellate court decisions, a private UTPCPL plaintiff, whose right to act arises under UTPCPL section 9.2, must show that he or she was damaged as a result of a defendant's unlawful act.[7] *Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d

---

7. In its entirety, UTPCPL section 9.2(a) reads as follows:

"(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this Act, may bring a pri-

442, 446 (2001) (section 9.2 "clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action"). This requires a private plaintiff to show "a causal connection between the unlawful practice and a plaintiff's loss." *DiLucido v. Terminix International Inc.,* 450 Pa. Super. 393, 402, 676 A.2d 1237, 1241 (1996).[8]

Because reliance is an integral element of a fraud claim, it has been stated that "fraud is an inappropriate vehicle upon which to predicate a class action." Cf. *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 471, 619 A.2d 769, 774 (1993). Similarly, the Pennsylvania Supreme Court recently remarked that the causation requirement found in all private UTPCPL actions presented "questions of fact applicable to each individual private plaintiff" that would be "numerous and extensive." *Weinberg,* 565 Pa. at 618, 777 A.2d at 446. The same is true in this case. Here, the plaintiffs would have the burden of establishing that the damage suffered by each member of the class was caused by the defendants' improper conduct. This would require reviewing the reasons of each class member for entering into the transaction. Such an undertak-

---

vate action to recover actual damages or $100, whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than $100, and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." 73 Pa.C.S. §201-9.2.

8. The private right of action under the CSA arises from the Act's characterization of CSA violations as UTPCPL violations. 73 Pa.C.S. §2190. This transforms the plaintiffs' CSA claim into a UTPCPL claim and subjects it to the same causation requirements as any other UTPCPL claim.

ing would involve a painstaking survey of each class member's transaction, each of which appears to have taken place under different circumstances, and belies the argument that common questions exist and predominate over individual questions.

The plaintiffs attempt to skirt this issue by arguing that an agency and/or fiduciary relationship between the class members and the defendant was created, thus establishing a presumption of reliance and eliminating the need for the plaintiffs to prove a causal relationship on an individual level. See *Basile v. H & R Block Inc.,* 729 A.2d 574, 584 (Pa. Super. 1999), *rev'd on other grounds,* 563 Pa. 359, 761 A.2d 1115 (2000) (citing *Young v. Kaye,* 443 Pa. 335, 342, 279 A.2d 759, 763 (1971), for the principle that, "where fiduciary duty is established, general rule requiring affirmative showing of fraud is inapplicable"). To establish an agency relationship, a party must show "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Basile v. H & R Block Inc.,* 563 Pa. 359, 367, 761 A.2d 1115, 1120 (2000). Proof of an agency relationship may be made in the following manner:

"The existence of an agency relationship is a question of fact. . . . The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. . . . 'In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.' . . . However, we do not assume agency

by a mere showing that one person does an act for another." *B & L Asphalt Industries Inc. v. Fusco,* 753 A.2d 264, 269 (Pa. Super. 2000). (citations omitted)

Proving that an agency relationship existed between the class members and the defendants presents the same individual questions found in proving causation. While a common scheme or standard form could provide the basis for finding an agency relationship on a classwide scale, the complaint alleges neither of these. Indeed, it appears that the factual scenarios presented by each of the two plaintiffs are distinguishable: Floyd had little, if any, contact with the defendants prior to securing her loan, while Ortiz had several communications with the defendants before she agreed to the December loan.[9] This precludes using an alleged agency relationship to infer causation.

The same problem exists with the plaintiffs' argument that a confidential relationship was formed between the defendants and members of the class, giving rise to a fiduciary duty. A confidential relationship may be established under the following circumstances:

"Our Supreme Court has acknowledged that the concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line. The court has recognized, nonetheless, that the essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other. Accordingly, a confidential relationship

---

9. This also undercuts the plaintiffs' argument that their claims are typical of those of the class.

appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. . . .

"The possibility of a confidential relationship cannot be excluded by a concrete rule. So long as the requisite *disparity* is established *between the parties' positions* in the relationship, *and the inferior party places primary trust in the other's counsel,* a confidential relationship may be established." *Basile v. H & R Block Inc.,* 777 A.2d 95, 101-102 (Pa. Super. 2001). (citations, brackets and quotation marks omitted) (emphasis added)

As with an agency relationship, a confidential relationship with the defendants cannot easily be established for the class as a whole. Rather, the plaintiffs would have to show a disparity between the defendants' position and the position of each class member, as well as the weight each class member gave to the defendants' advice. This raises individual questions and precludes the court from addressing the confidential relationship en masse. As a result, the difficulties presented by the individual questions of fact outweigh any benefit that could be achieved by resolving this case as a class action, and the motion must be denied.[10]

---

10. While the court sympathizes with the plaintiffs, it does not change the fact that this action is not appropriate for certification. We can only note that a UTPCPL claim brought by the Pennsylvania Attorney General's office is not subject to the same causation requirements as a private cause of action and suggest that they pursue other avenues that may be available to them.

## CONCLUSIONS OF LAW

(1) The class action will not provide a fair and efficient method for adjudicating this controversy.

(2) Common questions of law or fact do not predominate over any question affecting only individual members.

(3) The claims raised by the representative party are not typical of the claims belonging to, and necessary for, the protection of absent class members.

(4) The court need not determine whether the proposed class representative will fairly and adequately assert and protect the interests of the class.

(5) The court need not determine whether the class is sufficiently numerous that joinder of all its members is impracticable.

For these reasons, this court determines that the instant case is not appropriate for disposition as a class action.

## ORDER

And now, October 8, 2001, upon consideration of plaintiffs Gale Floyd and Luz Ortiz' motion for class certification, oral argument before the court and all other matters of record, and in accord with the opinion being filed contemporaneously with this order, it is hereby ordered and decreed that the motion is denied.