**Corbett v. Snyder**

50

C.P. of Berks County, no. 08-6540.

*William A. Slotter, senior deputy attorney general,* for Commonwealth.

*Wesley Alvin Snyder,* pro se.

*Sydney Snyder,* pro se.

*Robin J. Gray,* for appellant Kenneth Roger Bennetch and appellee Cheryl Ann Bennetch.

*William D. Schroeder Jr.,* for appellee Styer.

*Stephen H. Price,* for appellee Waid.

*Elizabeth L. Long,* for appellant Hepford-Rennie.

*Kathryn L. Simpson,* for appellant Musser.

*Robert L. Feliciani III,* for appellant Hunt.

STALLONE, *J.,* November 18, 2008—This action arises out of the marketing and sale of wrap-around mortgages to various residents of Berks County and surrounding areas, through a series of six corporations engaged in the business of providing mortgage brokering, investment brokering and financial/investment counseling services. They consisted of (1) OPFM Inc. t/a Personal Financial Management, (2) Image Masters Inc., (3) Mortgage Assistance Professionals Inc., (4) Mortgage Assistance Professional II Inc., (5) Discovered Treasures Inc. and (6) D.I.V.I.D.I.T. Inc. (collectively known as the OPFM companies) and were operated out of four separate locations: 4700 Perkiomen Avenue, Reading, 4714 Perkiomen Avenue, Reading,

1270 Shelbourne Road, Reading, and 1672 Manheim Pike, Lancaster.[1]

The appellants, Jacquelyn Hepford-Rennie, Julie Ann Musser, Susan Louise Hunt and Kenneth Roger Ben-

---

1. Appellee Wesley Alvin Snyder was the president and sole shareholder of the OPFM companies. His wife, appellee Sydney Snyder, was an employee of the OPFM companies, serving as the human resources manager, and performed a variety of tasks, such as: (1) picking up all of the mail, including incoming mortgage account statements addressed to wrap-around mortgage participants, together with any payments made relative to those wrap-around mortgages; (2) dividing and segregating all mail arriving at the business locations at 4700 Perkiomen Avenue and 1270 Shelbourne Road; (3) delivering all incoming account statements for the wrap-around mortgage participants to the accountant for payment; (4) separating incoming checks for mortgage payments by wrap-around mortgage participants, ensuring that deposit tickets were prepared and monies deposited and delivering the deposit tickets to the accountant; (5) signing checks for each wrap-around mortgage participant's mortgage account for each of the recognized lending institutions; and (6) acting as human resources director for all six corporations.

The OPFM companies ultimately became the subject of a federal bankruptcy proceeding commenced on September 18, 2007 and Mr. Snyder was subsequently arrested and charged with numerous federal offenses arising out of the sale of these wrap-around mortgages. On November 9, 2007, he entered a plea of guilty to one count of mail fraud in federal court. As part of his plea, he agreed to make "full and complete disclosure of all assets . . . owned . . . or under his control . . . [and] not to transfer, dispose, sell, cash, assign, encumber or otherwise alienate any asset, including but not limited to any bank account, insurance policy or interest in real estate . . . ."

On February 13, 2008, Mr. and Mrs. Snyder entered into a surrender of property agreement with the office of the United States Attorney for the Middle District of Pennsylvania and with Lynn Feldman, in her capacity as Chapter 7 trustee for the bankruptcy estates of the OPFM companies. Pursuant to that agreement, Mr. and Mrs. Snyder represented that they had made a full and complete disclosure of their assets, representing the entirety of their real and personal property interests, agreed to transfer all right, title and interest in and to their assets to the

netch, were each employed as mortgage consultants by the OPFM companies.[2]

As mortgage consultants, the appellants' role was to advise potential customers of the availability of two alternative forms of financing: (1) a conventional loan secured by a mortgage from an outside lending institution, and (2) a conventional loan secured by a mortgage from an outside lending institution, coupled with a wrap-around mortgage through Image Masters Inc. If the latter alternative was chosen, the clients, as the appellants preferred to classify them, were told that they would have to obtain a conventional loan in an amount which was in excess of what they had originally needed or intended to borrow. They were further told that the excess funds would be invested for them by Image Masters Inc., thereby entitling them to a reduced interest rate and lower monthly mortgage payments on the Image Masters Inc. wrap-around mortgage, which monthly amount would be their only obligation to pay.

Thereafter, a closing was held on the conventional loan (always before a title insurance company representative),

---

bankruptcy estates of Image Masters Inc. and Mortgage Assistance Professionals Inc.

On July 2, 2008, Mr. Snyder was sentenced to federal prison for a period of no less than 12 years and two months.

Mr. and Mrs. Snyder did not appear or participate in any proceedings before this court.

2. Appellee Cheryl Ann Bennetch, the wife of appellant Kenneth Roger Bennetch, was employed as an office manager and accountant; appellee Alicia Mary Waid was employed as an accountant; and appellee Amy Lou Styer was employed as a mortgage consultant and financial planner. Styer filed a Chapter 7 bankruptcy proceeding on June 26, 2008 and did not appear or participate in any proceedings before this court.

followed by a second closing approximately one week later (usually at the client's home), at which time the Image Masters Inc. wrap-around mortgage was executed and the client would turn over those excess proceeds that he or she was entitled to from the conventional loan. What the client was not told was how the investments were made, or in what specific companies or funds the investments would be made, as well as the fact that a significant portion of the excess funds would be used to pay various conventional mortgage obligations of existing clients to various conventional lending institutions, together with office overhead and payroll, including substantial compensation in an unknown amount to the sole shareholder and president of the OPFM companies, that being appellee Wesley Alvin Snyder.

The Commonwealth commenced this action on May 23, 2008, by filing a complaint, together with a motion for preliminary injunction. Generally, the Commonwealth alleged in its complaint that the appellants were engaged in the operation of a *Ponzi scheme* in connection with the sale of these wrap-around mortgages, whereby over 800 consumers were wrongfully induced to mortgage the equity in their homes and to turn over the proceeds in exchange for promises of reduced mortgage interest rates and greater investment returns, resulting in a total collective loss of more than $36,000,000.

The Commonwealth contends, in support of these allegations, that the appellants' activities were in violation of the following paragraphs of section 201.2(4) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law:[3]

---

3. Title 73, 73 P.S. section 201-1 et seq. (Supp. 2008).

"(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods and services;

"(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

"(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

"(xxi) Engaging in any other fraudulent or deceptive conduct creates likelihood of confusion or of misunderstanding."

In its motion for preliminary injunction, the Commonwealth asked this court to enjoin the appellants from engaging in any further sale of mortgage financing and investment products and to correspondingly freeze all of their assets in an effort to prevent their dissipation, so that they could potentially be used to repay those customers of the OPFM companies who were victimized by this alleged *Ponzi scheme.*

Following the filing and service of the complaint, appellants Susan Louise Hunt, Kenneth Roger Bennetch and Julie Ann Musser filed preliminary objections to the Commonwealth's complaint.[4] This court overruled each set of preliminary objections following oral argument held on August 15, 2008.

---

4. Appellant Jacquelyn Hepford-Rennie filed an answer to the Commonwealth's complaint in lieu of preliminary objections.

Thereafter, beginning on August 18, 2008, this court held a seven-day evidentiary hearing on the Commonwealth's motion for preliminary injunction, at which time we received testimony from numerous witnesses called by the Commonwealth and also the appellants, along with 95 exhibits.[5] At the conclusion of that hearing, we entered the following order:

"And now, August 29, 2008, upon consideration of the *motion for a preliminary injunction* and after a hearing held pursuant to Pa.R.C.P. 1531(a), this court hereby grants the following preliminary injunctive relief, pending a hearing to determine whether a permanent injunction should be entered in the within matter:

"(A) Defendants Jacquelyn Hepford-Rennie, Julie Ann Musser, Susan Louise Hunt and Kenneth Roger Bennetch are restrained and enjoined from receiving monies and/ or payments for services, as an employee or otherwise, pertaining to the provision of mortgage financing and investment products;

"(B) Defendants Jacquelyn Hepford-Rennie, Julie Ann Musser, Susan Louise Hunt and Kenneth Roger Bennetch are restrained and enjoined from entering into contracts and/or agreements, oral, verbal and/or written, as an employee or otherwise, to provide mortgage financing and investment products.

---

5. The Commonwealth marked a total of 87 exhibits. Exhibit nos. 1 through 86 were admitted into evidence, while exhibit no. 87 was not. The appellants marked a total of 8 exhibits, none of which were admitted into evidence because they never requested their admission.

"(C) Defendants shall, within 20 business days of this order, prepare and serve upon the Commonwealth a financial statement which lists all transfers and assignments of assets and property valued in excess of $2,500 since January 1, 2007, indicating the name and address of the transferee or assignee, the value of the transfer or assignment, and the type and value of any consideration paid to said defendant; and a verification from each said defendant that the information he or she has provided has been provided subject to the penalty of perjury under 18 Pa.C.S. §4904. Each such financial statement shall be served upon Commonwealth by facsimile or overnight delivery.

"(D) A hearing to establish whether a permanent injunction should be entered will be held by this court beginning at 9:30 a.m. on April 20, 2009. All discovery shall be completed no later than February 13, 2009, with expert reports to be exchanged on February 13, 2009 and 21 days thereafter for rebuttal reports. A pre-hearing conference will be at 9:30 a.m. on April 13, 2009, before the undersigned."

All four mortgage consultants (the named appellants herein) each filed a timely appeal from the entry of this order to the Commonwealth Court of Pennsylvania. Thereafter, the appellants filed written motions with this court for stay of its order and the trial proceedings scheduled for April 20, 2009, which we denied. The appellants then proceeded to file similar motions with the Commonwealth Court, which also included an alternative request for an expedited appeal. Following oral argument held on October 28, 2008, the Commonwealth Court denied the appellants' request for a stay, but granted their request for an expedited appeal.

In order to facilitate this expedited appeal, we hereby set forth our brief statement of the reasons for the entry of the order of August 29, 2008.

In order for the Commonwealth to be entitled to preliminary injunctive relief, it was required to establish, by a preponderance of the credible evidence, that (1) such relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) that greater injury would result from refusing injunctive relief than from granting it; (3) that the requested injunctive relief will restore the parties to the status quo that existed immediately prior to the alleged wrongful conduct; (4) that the plaintiff is likely to prevail on the merits; (5) that the injunctive relief sought is reasonably suited to abate the offending activity; and (6) that the issuance of such relief will not adversely affect the public interest. *Summit Towne Centre Inc. v. Shoe Show of Rocky Mount Inc.,* 573 Pa. 637, 828 A.2d 995 (2003).

In making our determination in favor of the Commonwealth, we relied upon the Mortgage Bankers and Brokers and Consumer Equity Protection Act,[6] which defines a mortgage broker as:

"A person who directly or indirectly negotiates or places mortgage loans for others in the primary market for consideration."

In interpreting this provision, the Commonwealth Court has held that mortgage brokers owe a fiduciary duty to their customers. *McGlawn v. Pennsylvania Human Relations Commission,* 891 A.2d 757, 769 (Pa.

---

6. Title 63, 63 P.S. section 456.302 (Supp. 2008).

Commw. 2006). It is hornbook law that a fiduciary duty represents a duty of candor, honesty and loyalty toward another and a duty to act in that person's best interests. Blacks Law Dictionary (8th ed. 2004). This means that a mortgage broker, who is in a position of trust and confidence vis-à-vis his or her client, must act with scrupulous fairness and good faith in dealing with the client and refrain from using his or her position to the client's disadvantage. *Young v. Kaye,* 443 Pa. 335, 342, 279 A.2d 759, 763 (1971). This includes advising the client of all relevant facts and circumstances known to the broker. *DiPalma v. LaLiberte,* 1996 WL 480729, 2 (E.D. Pa. Aug. 16, 1996); see also, *Alfaro v. E.F. Hutton & Co. Inc.,* 606 F. Supp. 1100, 1120 (E.D. Pa.1985); *Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa. Super. 165, 183, 514 A.2d 552, 560-61 (1986); *Fox Intern. Relations v. Fisery Securities Inc.,* 490 F. Supp.2d 590, 615 (E.D. Pa. 2007).

Although it was undisputed by the parties that the individual appellants were not required to hold a mortgage brokers license, since they were employees of a licensed broker, namely Wesley Alvin Snyder, they performed all of the functions of licensed mortgage brokers and, therefore, owed the same fiduciary duty to act with the utmost candor, honesty and loyalty, by providing all material information to their clients in order to allow them to make an informed decision as to whether or not to enter into a wrap-around mortgage. However, the record demonstrates, as this court found, that the appellants failed to do so.[7]

---

7. Moreover, it should be noted that the appellants were compensated only on a commission basis for the sale of these wrap-around

More specifically, the record will show that the appellants failed to provide full and complete information as to how or where the investments of the excess funds were to be made; on the contrary, the appellants simply told their clients that Wesley Alvin Snyder (who most of them never met) knew how to invest the funds and that the investments would be made wisely in low risk mutual funds. The clients were never provided with copies of documents that were eventually signed by them at the second closing, except in those few instances where they specifically asked for them. For that matter, the appellants not only did not give their customers the opportunity to review those documents prior to or at the second closing, they did not take the time to read or otherwise review or explain the language in these documents to them, even though the appellants knew that the clients were certainly not sophisticated as to this type of unique transaction. They likewise never advised their clients that the conventional loan and mortgage would remain in effect, despite the second closing, and/or that the wrap-around mortgage would not be recorded in the county recorder of deeds office. Instead, they simply told their clients that the conventional mortgage was a mere formality, which was in all situations patently not true. The clients were likewise never advised that they had the option to ask for language to be inserted in the Image Masters wrap-around mortgage documents requiring that the conventional loan and mortgage be paid off in its entirety upon the completion of their payments on the Im-

---

mortgages. And those commissions were based solely on the amount of the excess funds turned over to Image Masters Inc. at the second closing. The clients were not given that information by the appellants.

age Masters loan, but were simply told that the monthly payment to Image Masters Inc. was the only obligation which they had to pay.

And despite the appellants having been advised as early as May 2007 that payments on the outstanding wrap-around mortgages were not being made in a timely fashion, they never informed any of their prior, current or subsequent clients of that fact at any time thereafter, but instead boldly continued to sell these wrap-around mortgages to unsuspecting new consumers all the way up through September 18, 2007, when the OPFM companies formally filed for bankruptcy, a fact that the appellants knew or should have known was inevitable and would certainly be to their clients' detriment.

In view of the fiduciary duty imposed upon the appellants under Pennsylvania law, in their capacity as mortgage consultants selling these wrap-around mortgages to customers, and of their failure to meet that duty, we believe that the evidence sufficiently establishes each and every one of the six elements necessary for the entry of preliminary injunctive relief in this case.

And so, for these reasons, we respectfully request the Commonwealth Court to deny the instant appeals.